FILED
2022 Sep-28  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **ROCKY LANE BELL,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **4:20-cv-01962-ACA** |
| | ] | |
| **HUNTER AKINS, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In a case of very bad timing, Plaintiff Rocky Lee Bell pulled his car into the driveway of a suspected drug dealer's house shortly before Dekalb County deputy sheriffs executed a search warrant for that house. Mr. Bell, who suffers from "foot drop" and cannot walk without a cane, was only there to pick up his cousin but the deputy sheriffs did not know that. Defendant Dalton Veal pulled Mr. Bell from his car and struck him five times on his face and the side and back of his head before painfully twisting his fingers while placing him in handcuffs. Later, Deputy Veal pulled Mr. Bell by his handcuffs from the back of a truck where he was sitting, injuring his shoulder, and proceeded to kick Mr. Bell while telling him to walk. Defendant Hunter Akins then arrested Mr. Bell for loitering, a charge that was eventually dropped.

Mr. Bell sued Deputy Veal for unlawful search and seizure ("Counts One and Two") and excessive force ("Count Three"), and sued Deputy Akins for false arrest ("Count Four"), all under 42 U.S.C. § 1983. Deputies Veal and Akins jointly move for summary judgment on all counts. (Doc. 17). Mr. Bell concedes all of his claims except Count Three, the claim of excessive force against Deputy Veal. (Doc. 23 at 3). The court therefore **GRANTS** the motion for summary judgment with respect to Counts One, Two, and Count Four without further discussion of those claims.

Mr. Bell opposes summary judgment on Count Three, in which he claims that Deputy Veal used excessive force by repeatedly punching him in the face and head, by twisting his fingers while putting on the handcuffs, and by pulling him by his handcuffs from the back of a truck where he had been seated. The court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment on this count. Taking the facts in the light most favorable to Mr. Bell, it was clearly established at the time of the incident that no reasonable officer could have thought it reasonable to punch Mr. Bell five times in the head and face or to pull him off the tailgate by his handcuffs and kick him when he could not walk on his own, so the court **DENIES** Deputy Veal's motion for summary judgment with respect to those uses of force. But no evidence indicates that Deputy Veal used excessive force while putting the handcuffs on Mr. Bell, so the court **GRANTS** the motion for summary judgment with respect to that use of force.

## I.     BACKGROUND

The parties tell very different versions of the event at issue in this case. Because this matter is before the court on Deputy Veal's motion for summary judgment, the court must "draw all inferences and review all evidence in the light most favorable to" Mr. Bell. *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted). Accordingly, the court's description of events accepts as true Mr. Bell's version, bearing in mind that a jury may make findings different from the facts described in this opinion. *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

On January 13, 2020, deputies from the Dekalb Sheriff's Office went to execute a search warrant at Craig Bodiford's house based on information from a confidential informant that he was dealing marijuana there. (Doc. 18-2 at 7; doc. 18-3 at 2). According to the lead agent, Mr. Bodiford's house was "a very well known drug house." (Doc. 18-2 at 7, 18).

On the same day, Mr. Bell went to pick up his cousin from Mr. Bodiford's house. (Doc. 18-1 at 11, 13). Mr. Bell was a 54 year old man, standing 5'4" and weighing 115 to 120 pounds. (*Id.* at 5, 28). In addition to his age and small stature, he suffers from a disability called foot drop, caused by an "incomplete spinal cord

injury" years earlier. (*Id.* at 8). His disability causes his right leg to drag, requiring him to lift his leg with his hands when seated and to use a cane to walk. (*Id.* at 8, 21).

Mr. Bell arrived at Mr. Bodiford's house moments before the deputies did. (*See* doc. 18-1 at 11). When he pulled into the driveway, another car was exiting, so he backed up and pulled to the other side of the driveway, where he stopped. (*Id.*). There were six or seven cars already in Mr. Bodiford's driveway and approximately fifteen people, including Mr. Bell, in or around the house, either on foot or in cars. (*Id.* at 8–9; doc. 18-7 at 7). Just after Mr. Bell pulled to the left, police officers came in "car after car" with guns drawn and "told everybody to freeze." (*Id.* at 11). Mr. Bell turned off his car and put his hands up. (*Id.*).

Deputy Veal, a 26 year old, 5'11" and 215 pound man, approached the side of Mr. Bell's car with his gun pointed at Mr. Bell, opened Mr. Bell's car door, and told Mr. Bell to get out of it. (Doc. 18-1 at 11, 14; doc. 18-7 at 5, 15). Before Deputy Veal arrived at the house, he had no information indicating that Mr. Bell was connected to Mr. Bodiford's house or the suspected drug activities there. (Doc. 18-7 at 5).

At Deputy Veal's order, Mr. Bell told Deputy Veal that he was disabled and needed to reach down "and assist [his] right leg to get it to come over, because [he] can't get it up." (Doc. 18-1 at 11; *see also* doc. 18-7 at 8). Deputy Veal testified that

he understood Mr. Bell had foot drop, a condition Deputy Veal was familiar with because his best friend also had it, and he did not believe Mr. Bell was lying; he saw Mr. Bell's cane in the car. (Doc. 18-7 at 8, 15). Deputy Veal holstered his weapon and instructed Mr. Bell to give him his hand, which Mr. Bell did. (Doc. 18-1 at 11; doc. 18-7 at 8). Mr. Bell then reached down toward his leg. (Doc. 18-1 at 11, 14; doc. 18-7 at 8). Deputy Veal believed that Mr. Bell was reaching for "an object" (doc. 18-7 at 8) and told Mr. Bell to raise his hands, which Mr. Bell did (doc. 18-1 at 11).

Deputy Veal next ordered Mr. Bell to give him his hand, and when Mr. Bell did so, Deputy Veal pulled him out of the car. (Doc. 18-1 at 11). Being pulled out of the car caused Mr. Bell to lose his balance and fall toward Deputy Veal. (*Id.* at 11, 14). In "[p]retty much the same motion, without hesitation" (*id.* at 21), Deputy Veal pushed Mr. Bell away and hit him three times in the face with his fist, knocking out Mr. Bell's false teeth, cutting his mouth, and leaving a large puddle of blood on the ground (*id.* at 11, 14–15, 23–24; doc. 18-7 at 10). Deputy Veal took Mr. Bell down to the ground face first, punched him twice on the back and side of his head, and handcuffed him. (Doc. 18-1 at 11–12, 22, 24).

While Deputy Veal was putting the handcuffs on Mr. Bell, Mr. Bell was "hollering and screaming" at him to "[p]lease stop, I'm not resisting." (Doc. 18-1 at 12). Although Mr. Bell never resisted Deputy Veal (*id.* at 22), Deputy Veal yelled at

Mr. Bell to stop resisting and pulled his thumb back (*id.* at 12). Deputy Veal then grabbed another of Mr. Bell's fingers and pulled it back as well. (*Id.*; *see also id.* at 24). Deputy Veal testified that Mr. Bell was not resisting, but he twisted Mr. Bell's fingers while handcuffing him because that is how he was trained to maintain control of both hands while putting on the handcuffs. (Doc. 18-7 at 9–12).

Mr. Bell testified that when Deputy Veal twisted and pulled on his fingers, he dislocated Mr. Bell's thumb and broke his ring finger. (Doc. 18-1 at 12). Deputy Veal counters that the medical evidence does not show any broken bones. (Doc. 19 at 29; doc. 24 at 7). The medical evidence shows that, the day after this event, Mr. Bell went to the emergency room complaining of various injuries, including pain in his hand; with respect to his hand, the physician diagnosed him only with bruising. (Doc. 18-6 at 17). Mr. Bell offers no evidence to cast the objective medical evidence in doubt. And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). No reasonable jury could find that Mr. Bell had a broken or dislocated finger. But this fact does not disprove Mr. Bell's testimony that Deputy Veal pulled his fingers back, causing him pain. The court therefore accepts Mr. Bell's description of the painful handcuffing,

even though it does not adopt his testimony that one finger was broken and one was dislocated.

After handcuffing Mr. Bell, Deputy Veal knelt on Mr. Bell's back and told him not to move or he would shoot Mr. Bell. (Doc. 18-1 at 12). While Mr. Bell was laying on the ground, Deputy Veal searched Mr. Bell and found a $100 bill.[1] (*Id.* at 12, 16, 20). Deputy Veal left Mr. Bell on the ground and after some time Deputy Akins approached and asked Mr. Bell what he was doing there. (*Id.* at 15). When Mr. Bell said he had been instructed to stay here, Deputy Akins helped him up and seated him on the tailgate of a truck. (*Id.*; *see also* doc. 18-2 at 17). Deputy Akins found Mr. Bell's false teeth on the ground and returned them to him, asking if he was missing anything else. (Doc. 18-1 at 12; *see also* doc. 18-2 at 16). Mr. Bell told Deputy Akins about the $100 bill, but Deputy Akins did not see it on the ground nearby, so he went to find it and bring it back to Mr. Bell. (Doc. 18-1 at 12; doc. 18-2 at 17).

About five minutes later, Deputy Veal returned to the truck and said to Mr. Bell, "You told them I stole your money." (Doc. 18-1 at 12, 17). Mr. Bell was sitting on the tailgate with his legs dangling and his hands handcuffed behind his

---

[1] Deputy Veal asserts that he also found a pocketknife on Mr. Bell. (Doc. 19 at 8 ¶ 30; doc. 24 at 3). In support, he cites Mr. Bell's deposition, in which Mr. Bell testified that, in addition to the $100 bill Deputy Veal found on him, he also "had a little pocketknife, which I didn't find until like three months later, and it was like on—up where my windshield wipers go." (Doc. 18-1 at 20). This evidence does not support the assertion that Mr. Bell was carrying a pocketknife on his person or that Deputy Veal ever found the pocketknife, either on Mr. Bell or in his car.

back. (*Id.* at 17–18). Deputy Veal reached behind Mr. Bell, grabbed him by the handcuffs, and pulled him off the truck, causing Mr. Bell to fall toward the ground. (*Id.* at 17). Because Deputy Veal was holding him by the handcuffs, doing this pulled Mr. Bell's shoulder and tore ligaments there.[2] (*Id.*). Deputy Veal began kicking Mr. Bell and telling him to walk. (*Id.* at 17–18). Mr. Bell repeated that he could not walk because he was disabled, and Deputy Veal told him, "You'll walk or I'll, you know, kick you until you do," and continued to drag him by the handcuffs. (*Id.* at 12, 17).

Mr. Bell was ultimately arrested for loitering, in violation of Alabama Code § 13A-11-9(a). (Doc. 18-4 at 2; doc. 18-2 at 18). Under Alabama law, loitering is a "violation," Ala. Code § 13A-11-9(e), which is a step down from a misdemeanor, *see id.* § 13A-5-3(a), and carries with it a maximum sentence of 30 days' imprisonment in county jail and no more than a $200 fine, *id.* §§ 13A-5-7(b), 13A-5-12(b). The loitering charge was later dropped. (Doc. 18-1 at 26; doc. 18-7 at 16).

The day after this incident, Mr. Bell went to the hospital complaining of an arm and head injury. (Doc. 18-6 at 2). The physician diagnosed Mr. Bell with bruising on his forehead, left eye, left ear, and right hand. (*Id.* at 17). Although Mr. Bell also complained about pain in his jaw and hand and loss of hearing in his

---

[2] Deputy Veal has not contested Mr. Bell's testimony that he tore ligaments in his shoulder. (*See* doc. 19 at 9 ¶ 36).

left ear, the medical records indicate no findings about those injuries. (*Id.* at 2–4, 10–19). Mr. Bell testified that he later went to see an ear, nose, and throat doctor, who recommended that Mr. Bell have surgery and referred him to another doctor for a second opinion, but Mr. Bell has not been able to see the second doctor because of issues with his car. (Doc. 18-1 at 24–25).

## II.    DISCUSSION

Mr. Bell claims that Deputy Veal used excessive force in three separate ways: (1) by punching Mr. Bell five times as he pulled Mr. Bell out of the car and took him to the ground; (2) by breaking Mr. Bell's ring finger and dislocating his thumb; and (3) by yanking Mr. Bell of the tailgate by the handcuffs and then kicking him. (Doc. 23 at 7; *see* doc. 1 at 5). Deputy Veal contends that he is entitled to qualified immunity because (1) punching Mr. Bell was reasonable under the circumstances; (2) Mr. Bell has not produced any evidence of a broken or dislocated finger; and (3) Deputy Veal used only *de minimis* force in pulling Mr. Bell from the tailgate and kicking him. (Doc. 19 at 27–30).

The court will address each of the three allegations of excessive force separately but will start by describing the state of the law on qualified immunity and excessive force. Qualified immunity "protects an officer unless at the time of the officer's supposedly wrongful act the law was already established to such a high degree that every objectively reasonable officer in his place would be on notice that

what he was doing was clearly unlawful given the circumstances." *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022) (quotation marks omitted). Only "the plainly incompetent" or those who knowingly violate federal law are not entitled to qualified immunity. *Id.* (quotation marks omitted).

Qualified immunity involves a burden shifting analysis. At the first step, the officer asserting entitlement to qualified immunity must demonstrate that "he acted within his discretionary authority." *Powell*, 25 F.4th at 920 (quotation marks omitted). Mr. Bell does not dispute that Deputy Veal was acting within his discretionary authority. (*See generally* doc. 23). So the burden shifts to Mr. Bell to show that Deputy Veal's actions violated his constitutional rights *and* that "the right was clearly established at the time of the alleged violation." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019). The plaintiff must satisfy both requirements and the court may analyze them in either order. *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021).

A violation is clearly established in one of three ways: (1) by a materially similar decision of the United States Supreme Court, the Eleventh Circuit, or the Alabama Supreme Court; (2) by "a broader, clearly established principal" that controls "the novel facts of the case"; or (3) in the rare situation in which the conduct "so obviously violates the constitution that prior case law is unnecessary." *Powell*, 25 F.4th at 920 (quotation marks and alteration omitted). Mr. Bell relies on the first

and second methods to prove Deputy Veal's actions violated clearly established law. (Doc. 23 at 8–13). Under both methods, "the plaintiff must rely on decisional law": the first method requires that the facts Mr. Bell presents and the facts in the precedential authority he cites be materially similar and the second method requires Mr. Bell to prove that the legal principal is so clear that a reasonable officer would not need "specific guidance from a decision involving materially similar facts" to know that what he was doing was unlawful. *Powell*, 25 F.4th at 920.

The court analyzes claims of excessive force in the context of "an arrest, investigatory stop, or other 'seizure' of a free citizen . . . under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under the objective reasonableness test, the court does not consider what Deputy Veal subjectively thought or intended or what motivated him. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017); *see also Graham*, 490 U.S. at 397. Instead the court must determine if Deputy Veal's actions were objectively reasonable in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.") (citation omitted). The longstanding rule in the Eleventh Circuit is that an officer is not entitled to qualified immunity "if he or she uses gratuitous and excessive force

against a suspect who is under control, not resisting, and obeying commands." *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014) (collecting cases).

In deciding if Deputy Veal's actions were objectively reasonable, the court must "view the facts from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts" while balancing "the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Powell*, 25 F.4th at 921 (quotation marks omitted). To make this determination, the court does not review Deputy Veal's actions through the lens of hindsight and "make[s] special allowance for [his actions] in tense, uncertain, and rapidly evolving situations." *Id.* (quotation marks omitted); *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.") (citation and quotation marks omitted).

Among the factors the court must consider are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The court must also consider "the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted." *Saunders*, 766 F.3d at 1267 (alteration and quotation marks omitted). The injuries must be more than *de minimis*, but what

constitutes a *de minimis* injury "depends on the particular circumstances of the arrest." *Stephens*, 852 F.3d at 1325 & 1326 n.29.

1. The Punches

Under the version of facts applied at summary judgment, Deputy Veal's five punches to Mr. Bell's face and head were grossly disproportionate to the need for the use of force, a violation of the Fourth Amendment that was clearly established at the time. *See Saunders*, 766 F.3d at 1265 ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands"). Although none of the cases offered by Mr. Bell are materially similar to this case, the broader principal controls.

Deputy Veal argues that the five punches were objectively reasonable because a reasonable officer would have suspected Mr. Bell purchased or possessed illegal drugs; execution of a narcotics search warrant presents a "high-risk situation that presented an extreme risk of harm to [him]" and bystanders; and a reasonable officer would have perceived a threat and an attempt to escape because Mr. Bell could have been armed and moved toward him when exiting the car. (Doc. 19 at 27–29; doc. 24 at 4–5). To be sure, a jury may agree with Deputy Veal's interpretation of the facts. But to accept his version of the facts would require the court to construe the evidence

in the light most favorable to Deputy Veal, in contravention of the summary judgment standard. *See Hamilton*, 680 F.3d at 1318.

Accepting the facts in the light most favorable to Mr. Bell but viewing them from Deputy Veal's perspective, Deputy Veal was part of a narcotics task force executing a search warrant of Mr. Bodiford's "well known drug house." (Doc. 18-2 at 7, 18). When the police arrived, there were numerous people in and around the house, some of them in cars. (Doc. 18-1 at 8–9; doc. 18-7 at 7). Mr. Bell was inside one of those cars. (Doc. 18-1 at 11). When Deputy Veal—a young, large, and fit man—approached Mr. Bell's car, he saw an older, slightly built man who immediately turned off the car when the police surrounded it. (Doc. 18-1 at 5, 11, 28; doc. 18-7 at 15). He did not have any information other than Mr. Bell's presence on the scene to indicate that he was a part of the crime or crimes being investigated. (Doc. 18-7 at 5). When Deputy Veal told Mr. Bell to get out of the car, Mr. Bell told him that he was disabled and needed to lift his leg to do so. (Doc. 18-1 at 11; doc. 18-7 at 8). Deputy Veal saw Mr. Bell's cane and testified that he understood and believed Mr. Bell was disabled. (Doc. 18-7 at 8, 15).

Deputy Veal opened Mr. Bell's car door and saw Mr. Bell begin to reach down for an object. (Doc. 18-1 at 11, 14; doc. 18-7 at 8). When he told Mr. Bell to raise his hands, Mr. Bell complied immediately, and when he ordered Mr. Bell to give him his hand, Mr. Bell complied again. (Doc. 18-1 at 11). And, despite knowing

14

that Mr. Bell was small and disabled, Deputy Veal forcibly pulled Mr. Bell toward him to get him out of the car, causing Mr. Bell to fall forward. (*Id.* at 11, 14). When Mr. Bell fell toward Deputy Veal, Deputy Veal punched him three times in the face, took him down to the ground face first, and punched him twice more on the side and back of his head. (*Id.* at 11–12, 14–15, 21, 24). At no point did Mr. Bell resist Deputy Veal. (*Id.* at 22).

Viewed in this light, Deputy Veal's use of force as he pulled Mr. Bell from the car and took him to the ground was objectively unreasonable. The most important *Graham* factor in this case is the third: whether the suspect is actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 693. Deputy Veal does not contend that Mr. Bell resisted arrest or attempted to flee, but instead argues that a reasonable officer might have believed he was resisting arrest because Mr. Bell made "contact with Veal as Veal was helping Bell exit the vehicle." (Doc. 19 at 28). But this interpretation of the facts requires the court to ignore the fact that, viewed in the light most favorable to Mr. Bell, Deputy Veal—who knew and believed that Mr. Bell had limited use of one of his legs—pulled Mr. Bell forcefully out of the car, causing Mr. Bell to fall toward Deputy Veal. In that situation, no reasonable officer would believe that Mr. Bell's contact with Deputy Veal was an attempt to resist or escape. Under the facts taken in the light most favorable to Mr. Bell, he made no attempt to flee or resist arrest, so no force was necessary.

The second *Graham* factor is whether the suspect poses an immediate threat to the safety of the officers or others. 490 U.S. at 396. This factor also weighs heavily in Mr. Bell's favor. The only evidence that Mr. Bell might be any sort of threat was his single move toward his leg immediately after he told Deputy Veal that he was disabled and needed to lift his leg to get out of the car. Deputy Veal testified that he believed Mr. Bell's statement about his disability (doc. 18-7 at 8, 15), and he has not offered any evidence to indicate that a reasonable officer would have believed Mr. Bell was armed. Moreover, after Mr. Bell made that first move toward his leg, he stopped on Deputy Veal's command and then complied with all of Deputy Veal's later orders. In this specific context, a single failure to obey a command is not sufficient to make a reasonable officer objectively believe that Mr. Bell was a threat warranting five punches to the head and face. *See, e.g.*, *Hadley v. Gutierrez*, 526 F.3d 1324, 1327, 1330 (11th Cir. 2008) (holding that an officer used excessive force by punching a handcuffed individual accused of entering a grocery store, yelling and running around and knocking items off the shelves while high on cocaine, simply for asking for Jehovah's protection); *see also Richmond v. Badia*, __ F.4th __, No. 20-14337, at *16 (11th Cir. Aug. 22, 2022) (explaining that a "minor transgression" like brushing the defendant's hand away from the plaintiff's face "does not mean that the force allegedly used was a constitutionally permissible response, or that the

agent [is] entitled to qualified immunity") (quotation marks omitted) (alteration in original).

The final *Graham* factor—the severity of the crime at issue—weighs weakly in favor of Deputy Veal. *See* 460 U.S. at 396. Deputy Veal contends that a reasonable officer could have suspected Mr. Bell of "purchasing or already possess[ing] illegal narcotics" because of his presence at the suspected drug house that the officers were about to search. (Doc. 19 at 27). The court agrees that a reasonable officer could have suspected, based on Mr. Bell's presence at the house, that Mr. Bell was there to purchase or possess narcotics. But suspecting someone of purchasing or possessing narcotics cannot alone outweigh the use of force on an unresisting, compliant suspect who has been following orders. *See, e.g.*, *Stryker v. City of Homewood*, 978 F.3d 769, 776 (11th Cir. 2020) ("[T]here was no doubt at the time of this incident that, in this Circuit, striking a compliant and nonthreatening suspect constitutes excessive force."); *Smith v. Mattox*, 127 F.3d 1416, 1418–20 (11th Cir. 1997) (holding that an officer used excessive force by breaking the arm of a suspect found in the front yard of a house where a reverse-sting drug operation was planned, even though the suspect had first threatened and then fled the police, because he was no longer resisting or attempting to flee when the force was used).

Deputy Veal also highlights that execution of a search warrant for narcotics is a high risk situation. (Doc. 19 at 27). The court agrees that execution of a search

warrant *can be* a high risk situation, but no evidence presented to the court in this case indicates that execution of *this* search warrant presented a high risk situation. The only case Deputy Veal relies on is a non-precedential district court opinion that involved very different evidence. *Cutino v. Untch*, 79 F. Supp. 3d 1305, 1312–13 (S.D. Fla. 2015). In *Cutino*, in addition to the information that someone was selling drugs out of a home, the officers had information "that a shooting homicide had previously occurred in the front yard, and that visitors had been seen carrying handguns in their waistbands," giving the officers "reason to be very cautious when they encountered [the plaintiff] in the bedroom," where they used force against him. *Id.* at 1312. Here, there is no evidence indicating what information the officers had about the level of danger they faced in executing the search warrant of Mr. Bodiford's home. At best, this *Graham* factor weighs weakly in Deputy Veal's favor.

The court's consideration of "the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted," *Saunders*, 766 F.3d at 1267 (alteration and quotation marks omitted), does not change its conclusion. In this case, no force was required because Mr. Bell was not resisting in any way. And while Mr. Bell's injuries from the punches ultimately amounted to cuts and bruises, the force used was enough to knock Mr. Bell's false teeth out of his mouth and leave a puddle of blood on the

ground. (Doc. 18-1 at 11, 14–15, 23–24). Given that Mr. Bell was not resisting, a jury could find these injuries were not *de minimis*. *See Stephens*, 852 F.3d at 1326 n.29 ("The amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."). Therefore, a jury could find Mr. Bell suffered a constitutional violation by Deputy Veal.

In addition, that constitutional violation was clearly established in January 2020, when this event occurred. Although Mr. Bell has not put forth any precedential cases presenting materially similar facts to this case, the Eleventh Circuit has repeatedly set forth the broader principle that "a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." (quoting *Saunders*, 766 F.3d at 1265 (collecting cases)). Most recently, the Eleventh Circuit addressed application of this principal in the qualified immunity context in *Richmond v. Badia.* __ F.4th at __, No. 20-14337, slip op. at 17–21.

In *Richmond*, which involved a situation that occurred in 2015, *see Richmond v. Badia*, 2020 WL 6866632, at *1 (M.D. Fla. Oct. 19, 2020), the plaintiff was a seventh-grade student who was involved in an altercation with his mother at his school's front office, *Richmond*, __ F.4th at __, No. 20-14337, slip op. at 3. When the defendant, a school resource officer, arrived, the plaintiff refused to look at him,

so the defendant grabbed the plaintiff's face. *Id.* at 4. The plaintiff stepped backwards and tried to block the defendant's arm, after which the defendant shoved the plaintiff, pushed him to the center of the lobby, took him to the ground using an "armbar" technique, and held him down for three minutes. *Id.* The Eleventh Circuit held that the use of force was excessive because the plaintiff "was being investigated for a misdemeanor, did not pose a threat to anyone's safety, . . . was not attempting to flee," engaged in no more than a "minor transgression" by brushing away the defendant's hand, and "did not refuse to obey any lawful commands." *Id.* at 16.

After finding that the force used was excessive, the Eleventh Circuit held that, as of 2015, that violation was clearly established. *Richmond*, __ F.4th at __, No. 20-14337, slip op. at 16–21). Citing the "broader, clearly established principle" that "a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," *id.* at 17–18 (collecting cases), the Court explained that this principle applies "when the excessive force is applied prior to the handcuffing" and "when the police have unnecessarily thrown non-resisting, unhandcuffed suspects on the ground," *id.* at 18 (quotation marks omitted).

Among the other cases discussed in the *Richmond* opinion is *Patel v. City of Madison*, in which an officer injured a 57 year old, 115 pound man whom police officers suspected might have been casing a neighborhood to commit a burglary. 959

F.3d 1330, 1333–35 (11th Cir. 2020). When officers stopped the plaintiff to ask him questions, he said, "no English" "India," and "my house," and pointed in the direction he was walking. *Id.* at 1334. After the plaintiff took several steps away from the officers, one officer used a leg sweep while holding the plaintiff's hands behind his back, causing the plaintiff to hit the ground face first. *Id.* at 1335. The Eleventh Circuit held that a jury could find the use of force excessive because the plaintiff "did his best to cooperate with the officers and obey [the officers'] commands" and had "made no movements of resistance." *Id.* at 1339–40. The Eleventh Circuit also found that the alleged violation was clearly established when it occurred in 2015, *id.* at 1333, because "if a jury believe[d the plaintiff]'s version of the facts—under which [he] was not resisting and was complying with the officers' commands when [the defendant] executed the swift and decisive leg sweep—it could reasonably find that [the defendant] knowingly violated this principle when he threw [the plaintiff] to the ground." *Id.* at 1343.

The principle that an officer cannot use "gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands," *Patel*, 959 F.3d at 1339, controls with respect to Mr. Bell's claim that Deputy Veal used excessive force by punching him five times in the face and head when Mr. Bell had not resisted arrest or attempted to flee and had not threatened anyone's safety. At most, Mr. Bell could not immediately comply with one order but instead explained

what he was going to do to comply with the order. He then complied with all other orders given to him. Accordingly, the court **DENIES** Deputy Veal's motion for summary judgment with respect to his part of Mr. Bell's excessive force claim.

2.  The Handcuffing

The next part of Mr. Bell's claim relates to Deputy Veal twisting and hurting his fingers when putting the handcuffs on Mr. Bell. Deputy Veal is entitled to qualified immunity with respect to this part of Mr. Bell's claim because no reasonable jury could find he used excessive force.

"Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002); *see also Stephens*, 852 F.3d at 1326 n.30 (collecting cases for the proposition that the Eleventh Circuit "has established the principle that the application of de minimis force, *without more*, will not support a claim for excessive force in violation of the Fourth Amendment[,] and specifically applied this principle to handcuffing in arrest situations") (quotation marks and citation omitted; emphasis in original). As explained above, the only evidence of injury to Mr. Bell's hands or fingers is some bruising. Eleventh Circuit precedent clearly establishes that this type of injury is *de minimis*. As a result, he cannot show that Deputy Veal violated a clearly established constitutional right when he handcuffed Mr. Bell. The court **GRANTS** Deputy Veal's motion for summary judgment with respect to this part of Count Three.

3.  <u>The Yanking of Handcuffs and Kicking</u>

The last part of Mr. Bell's excessive force claim arises from Deputy Veal pulling Mr. Bell, by the handcuffs, off the tailgate of the truck and then kicking him when he could not walk. (Doc. 23 at 11). Deputy Veal contends that he is entitled to qualified immunity from this part of the claim because he used *de minimis* force and Mr. Bell suffered only *de minimis* injuries. (Doc. 19 at 30; doc. 24 at 7).

As an initial matter, although Deputy Veal states that Mr. Bell suffered only *de minimis* injuries, his own statement of undisputed facts concedes that Mr. Bell testified he suffered torn ligaments in his shoulder. (Doc. 19 at 9 ¶ 36; *see* doc. 18-1 at 17). Deputy Veal offers no evidence to refute that testimony. And unlike the medical evidence refuting Mr. Bell's allegation about his broken and dislocated fingers, the medical evidence does not address Mr. Bell's shoulder in any way. (*See generally* doc. 18-6). Deputy Veal has not carried the initial burden, at summary judgment, of "identifying those portions of the record that demonstrate the absence of a genuine issue—which [he] may discharge by pointing to an absence of evidence to support the nonmoving party's case." *Deal v. Tugalo Gas Co., Inc.*, 991 F.3d 1313, 1324–25 (11th Cir. 2021) (quotation marks and alteration omitted). A reasonable jury could find that Mr. Bell suffered more than a *de minimis* injury.

Deputy Veal's other argument is that he used *de minimis* force when he pulled Mr. Bell off the tailgate by the handcuffs and kicked him. (Doc. 19 at 30). The court

disagrees: a jury could find that Deputy Veal used excessive force when he took these actions. Taking the facts in the light most favorable to Mr. Bell, but viewed from Deputy Veal's perspective, Mr. Bell had been sitting on the tailgate, handcuffed, without offering any resistance or hostility for around five minutes. (Doc. 18-1 at 12). Deputy Veal knew and believed that Mr. Bell had a disability impairing his ability to walk and had seen Mr. Bell's cane in the car. (Doc. 18-7 at 8, 15). For no reason whatsoever, Deputy Veal grabbed Mr. Bell by the handcuffs and yanked him off the tailgate, letting him fall face first toward the ground. (Doc. 18-1 at 17). When Mr. Bell stumbled, Deputy Veal kicked him and dragged him by the handcuffs, despite Mr. Bell telling him again about his disability. (*Id.* at 12, 17–18).

A jury could find that these actions constitute excessive force. Again, the most important factors here are the second and third: whether the suspect posed an immediate threat to the safety of the officers or others and whether the suspect was actively resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. It is undisputed that Mr. Bell posed no threat at all by this time and had made no attempt to resist arrest or flee. The remaining *Graham* factor is "the severity of the crime at issue." *Graham*, 460 U.S. at 396. At the time of this use of force, Mr. Bell was suspected of purchasing or possessing illegal drugs and he was never charged with

24

anything more serious than loitering. (Doc. 18-4 at 2; doc. 18-2 at 18); Ala. Code § 13A-11-9(a).

The court's consideration of "the need for the application of force, the relationship between the need and the amount of force used, and the extent of the injury inflicted" also weighs in favor of Mr. Bell. *Saunders*, 766 F.3d at 1267 (alteration and quotation marks omitted). As discussed above, no force was required, and Mr. Bell suffered torn ligaments from the use of force. Accordingly, a reasonable jury could find that all the factors weigh in favor of finding that Deputy Veal used excessive force.

The final question is whether Deputy Veal's use of excessive force was clearly established in January 2020. As discussed with respect to the punches, *Richmond* and the precedent it relied on clearly established this alleged violation. __ F.4th at __, No. 20-14337, slip op. at *17–18 ("[A] police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands.") (quoting *Saunders*, 766 F.3d at 1265); *see also Stephens*, 852 F.3d at 1327–28; *Hadley*, 526 F.3d at 1330; *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)); *cf. Fils v. Aventura*, 647 F.3d 1272, 1292 (11th Cir. 2011) (explaining that *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) and *Vinyard v. Wilson*, 311 F.3d

1340, 1355 (11th Cir. 2002) clearly established that tasing a suspect who was not hostile and not violent was excessive force). Although none of these cases present materially similar facts, they set out a sufficiently narrow principle of law that, given the facts under which this court must operate at the summary judgment stage, it would have been "obvious to a reasonable government actor that his actions violate[d] federal law." *Hadley*, 526 F.3d at 1333. Accordingly, the court **DENIES** Deputy Veal's motion for summary judgment on this part of Count Three.

## III.   CONCLUSION

The court **GRANTS IN PART** and **DENIES IN PART** Deputy Veal and Deputy Akins' motion for summary judgment. The court **GRANTS** the motion and **WILL ENTER SUMMARY JUDGMENT** on Counts One, Two, and Four. The court also **GRANTS** the motion and **WILL ENTER SUMMARY JUDGMENT** on the part of Count Three relating to Deputy Veal twisting Mr. Bell's fingers while putting him in handcuffs. The court **DENIES** the motion on the part of Count Three relating to Deputy Veal punching Mr. Bell before handcuffing him and the part of Count Three relating to Deputy Veal pulling Mr. Bell off the tailgate by his handcuffs and kicking him.

The court will enter a partial summary judgment consistent with this opinion.

**DONE** and **ORDERED** this September 28, 2022.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE